WITHROW *v.* SULLIVAN.

4-9943 253 S. W. 2d 339

Opinion delivered December 15, 1952.

Rehearing denied January 12, 1953.

*Wright, Harrison, Lindsey & Upton,* for appellant.

*Brooks Bradley* and *Josh W. McHughes,* for appellee.

GRIFFIN SMITH, Chief Justice. Thorough Waterproofing Company was the trade name applied to a business conducted by Charles P. Sullivan during the greater part of 1947. Early in 1948 he approached Nevil C. Withrow regarding future operations. Until October, 1948, Withrow's business was a partnership composed of his wife and himself; but in October a corporation designated Nevil C. Withrow Company was formed. For the purpose of this suit the corporation and Withrow are treated as one.

Sullivan's connection with Withrow began March 3, 1948. In suing for claimed balances Sullivan alleged successive verbal contracts. Initially he was to be paid weekly wages equivalent to the union scale, "which was going to be" $2 per hour. At the end of the year a differential sufficient to bring his income to $10,000 would be paid. This arrangement, according to Sullivan, resulted from Withrow's unwillingness or inability to carry a heavy payroll and provide sufficient unimpaired operating capital. Withrow, says Sullivan, agreed to reduce the agreement to writing, but explained several weeks later that his attorney had advised against a fixed commitment. In explaining Withrow's attitude Sullivan testified that the amount could or would be increased to as much as $15,000 the second year if the business continued to operate at a profit.

Sullivan's equipment was purchased for slightly more than $1,200.

Approximately six weeks after the oral contract is alleged to have been made Withrow informed Sullivan of his attorney's objection to a flat guarantee; thereupon (says Sullivan) Withrow advanced a second proposal. It is claimed that under this recast relationship wages were to be paid as in the past—that is, there would be weekly withdrawals equivalent to the prevailing union scale applicable to a superintendent;—but the actual measure of compensation would be supplemented by 10% of the gross earnings of the waterproofing division. In testifying Sullivan said that under the first agreement actual weekly withdrawals were to be $80, but that at the end of the year the difference between this sum and the union schedule would be considered as earned. The same arrangement applied to the second contract except that instead of a flat $10,000 differential Sullivan would receive 10% of the gross profits. Gross profits were to be ascertained after a third of the office, warehouse, rentals and insurance charges had been deducted.

The weekly payments fluctuated from $80, to $85, then to $100, and finally to $135.

Sullivan was very certain that Withrow had agreed to permit occasional examination of the books. Until a temporary agreement was made February 23, 1951, the contract now sought by Sullivan to be established rested entirely upon disputed parol, and notwithstanding his assertions respecting the first understanding and Withrow's flat refusal to put it into effect, Sullivan entered into the second employment stage with nothing to substantiate what is now claimed to have been a definite commitment other than his construction of promises alleged to have been verbally made.

Sullivan readily conceded that Withrow had breached his first contract, but just as unhesitatingly asserted that the second arrangement was projected at a time when he had complete confidence in Withrow's veracity.

A voucher-check for $2,500, marked "bonus" was issued to Sullivan in August, 1949. The payee contended

that in cashing the check (the voucher portion of which was detached and retained by Sullivan) he did not notice the word *bonus;* and, inferentially, he did not observe that $375 had been deducted for "W.H. [withholding] tax", leaving the net amount $2,125. Printed on the voucher was the following: "By the acceptance and endorsement of the attached check the payee acknowledges payment as shown above".

Sullivan knew—but the date of this information is not given—that the business lost money in 1949. He then added that no question was being raised that the $2,500 item was full payment for the first year. This statement was later contradicted.

About January 1, 1951, Sullivan was shown a financial statement disclosing losses in operation of the waterproofing division. He insists that for a protracted period efforts had been made to inspect the company books, but he was put off with the explanation that the records were in an auditor's hands. Sullivan explained that the higher weekly withdrawals were "cost of living increases".

Severance of relationship occurred when on February 23, 1951, Withrow wrote Sullivan that certain personal promotion work the latter was doing on company time was unsatisfactory. He was allowed to continue working, as the letter expressed it, "until you procure another place". Sullivan does not contend that participating interests were payable after Withrow wrote this letter.

An independent audit of Withrow's books was made at the Chancellor's suggestion. Attached to Sullivan's complaint was a statement showing that from March 3, 1948, to February 1, 1951, the amount appellee received was $14,027.50. The sum claimed to have been earned as union wages plus a superintendent's stipend was $20,176.87, and the asserted unpaid portion was set out as $6,049.37. This is in addition to 10%.

The decree disallowed the additional wage claims, but gave Sullivan a 10% participating profit, less the bonus. The judgment was for $5,085.34.

Withrow was emphatic in his denial of the contract Sullivan seeks to establish. The original consideration resulting in the employment included purchase by Withrow of Sullivan's Thorough Waterproofing Company's equipment. This was paid for and Sullivan's duties were those of a superintendent, starting at $2 per hour, with a 40-hour week. Withrow did not, at that time, have union connections. He became contractually affiliated in the spring of 1951. The several increases in hourly compensation were agreed to because the company considered that its men were entitled to more pay as the cost of living advanced. Workers other than Sullivan were included in wage boosts. Although Sullivan was paid weekly with hours as a basis, deductions do not appear to have been made for partial weeks, and sometimes expense charges were allocated to different jobs. The latter practice is illustrated by a check-stub in evidence of a payment made to Sullivan for the week ending August 23, 1950. Twenty hours of time put in by Sullivan were apportioned to The First Methodist Church contract (at $2 per hour) and the remaining half to Warehouse ("Consistory"). It is noteworthy that the payment is marked "wages, less social security, $1.50, [and] withholding tax and insurance, $8.05".

The bonus payment, said Withrow, was more than a gratuity, but it was in no sense contractual. The waterproofing division had made money that year and the feeling was that those who primarily promoted the current success should be rewarded. Minutes of directors' meetings were introduced, one showing that on August 3, 1949, the chairman (Withrow) "proposed" that Sullivan be paid $2,500 as a bonus. This was later changed by substituting the word "reported". It was felt by Sullivan's counsel that the alteration was an afterthought and that the minutes did not correctly reflect what was actually done. Comments made by the Chancellor indicate that he did not attach any importance to the alteration, and we agree in that respect.

Circumstances that cannot be ignored or explained away strongly substantiate Withrow's understanding of the contract. For instance, the union wage scale from

August 24, 1950, to December 31 of the same year was $3 per hour, but Sullivan was paid $3.37½ an hour. From January 1, 1951, to February 21, the union scale was $3.25, but Sullivan drew $3.37½. The result is that from August, 1950, appellee was being paid more than the union wage.

The case is difficult, as the Chancellor undoubtedly found, because the word of one man was challenged by the other. But it is inconceivable that Sullivan can be correct in his insistence that he did not read the notation on the bonus check. In the first place each party agrees that the bonus was to be $2,500, yet the check was for $2,125 when reduced by $375 representing withholding tax. It seems wholly unreasonable that one who expected $2,500 would accept $2,125 without observing the deduction. This, however, is not controlling. For many years Sullivan had been a railway locomotive fireman with final monthly earnings of from $350 to $450. It is not disputed that he told Withrow that operation of his (Sullivan's) waterproofing business could not be satisfactorily handled by one man, and Withrow's testimony is that Sullivan approached him and suggested selling. Seemingly the price fixed by Sullivan was satisfactory.

There is nothing, other than Sullivan's contention, to indicate that at year's end (the company's fiscal period closed Sept. 30) demands were made for settlement, or that a claim was advanced for the sums now contended for. Surely, after Withrow had declined to perform under the first agreement, any prudent person looking back upon the first default Sullivan alleged, would have required something more tangible than parol as a guarantee that wages would be paid under the verbal stipulation, and that in addition he would be given ten percent of the so-called "gross" earnings—earnings not based upon company profits, but upon income less relatively small deductions.

Nothing has been pointed to in Withrow's conduct covering a period of nearly three years to distinguish his actions from the course any business man or organization would be expected to follow. Not until the letter of

378

dismissal was received did Sullivan pursue an affirmative course other than to say at trial that he asked for account book information and discussed with Withrow the adjustments now said to be due. On the other hand every scrap of writing, such as checks, vouchers, payrolls, etc., shows ordinary business procedure with no indication that differentials were in dispute. In these circumstances, where the burden of proving the oral contract was upon appellee, we are unable to say that the evidence preponderates in Sullivan's favor, or that it is evenly balanced.

Reversed and cause dismissed.